IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

KIM ANTOINETTE WILLIAMS,  )
)
Plaintiff,  )
)
v.  )   CIVIL ACTION NO. 2:13-cv-703
)
CAROLYN W. COLVIN,  )
ACTING COMMISSIONER,  )
SOCIAL SECURITY ADMINISTRATION,  )
)
Defendant.  )

## REPORT AND RECOMMENDATION

Plaintiff Kim Antoinette Williams ("Ms. Williams" or "Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) that seeks judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner" or "Defendant"), which denied Ms. Williams's claim for Supplemental Social Security Income ("SSI") pursuant to Title XVI of the Social Security Act. Both parties filed motions for summary judgment, ECF Nos. 7 and 9, with briefs in support, ECF Nos. 8 and 10, which are now ready for a recommended resolution.

This action was referred to the undersigned U.S. Magistrate Judge by order from the Chief U.S. District Judge, *see* ECF No. 5, pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned disposes of the cross motions for summary judgment on the papers without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the

following reasons, the undersigned **RECOMMENDS** that Ms. Williams's motion for summary judgment, ECF No. 7, be **GRANTED** to the extent it seeks reversal and remand of the Acting Commissioner's decision; the Defendant's motion for summary judgment, ECF No. 9, be **DENIED**; the final decision of the Acting Commissioner be **VACATED**, and that this matter be **REMANDED** for further proceedings consistent with this recommendation.

## I. PROCEDURAL BACKGROUND

Ms. Williams filed an application for SSI on May 21, 2010,[1] alleging a disability onset date of September 24, 2003, R. 11,[2] due to asthma and reading and writing difficulties. R. 162 (Ms. Williams "can barely read or write more than [her] name.").[3] This application was initially denied on September 10, 2010, and denied again upon reconsideration on April 26, 2011. R. 11. Ms. Williams requested a hearing in front of an administrative law judge ("ALJ") on April 28, 2010, which was held on July 24, 2012. *Id.* The ALJ issued his decision on August 3, 2012, which denied Ms. Williams's application. R. 21. The Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Ms. Williams's request for review of the ALJ's decision on October 25, 2013. R. 1. After exhausting her administrative remedies, Ms. Williams filed her complaint for judicial review of the Acting Commissioner's final decision on December 18, 2013. ECF No. 1. The Acting Commissioner filed an answer on March 5, 2014. ECF No. 3. Because both parties have filed motions for summary judgment, the matter is now ripe for adjudication. ECF Nos. 7 and 9.

---

[1] The application for Supplemental Security Income Benefits is dated June 4, 2010, R. 135, but the ALJ's decision notes the application date is May 21, 2010, R. 11. "R." refers to the certified administrative record that was filed under seal on March 5, 2014, pursuant to Local Civil Rules 5(B) and 7(C)(1).

[2] It appears from the record that Ms. Williams previously filed two applications for Social Security Income Benefits – one was filed on January 3, 2008, and the other was filed on September 23, 2003 – both of which also alleged a disability onset date of September 24, 2003. R. 49.

[3] In the prior ALJ decision for the January 3, 2008 SSI application, the ALJ identified Ms. Williams's inability to read or write as possible borderline intellectual functioning. R. 52.

## II. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the Acting Commissioner's decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); *see also Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *2 (D.S.C. June 27, 2011) (requiring reversal if decision fails to provide sufficient analysis to establish proper application of the law) (internal citations omitted).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court must examine the record as a whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Acting Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. Moreover, the Acting Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays*, 907 F.2d at 1456-57. Overall, if the Acting Commissioner's

resolution of the conflicts in the evidence is supported by substantial evidence, the Court is to affirm the Acting Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996) (granting the Commissioner latitude in resolving inconsistencies in the evidence, which the Court reviews for clear error or lack of substantial evidence). However, "[t]he court may remand a case to the Commissioner for a rehearing under sentence four . . . of 42 U.S.C. §405(g)" if the ALJ does not provide substantial support for his decision, or if the ALJ incorrectly applies the law. *Strong*, 2011 WL 2938084, at *2 (citing *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision); *Jackson v. Chater*, 99 F.3d 1086, 1090-91 (11th Cir. 1996)). "The [Commissioner] and the claimant may produce further evidence on remand." *Strong*, 2011 WL 2938084, at *2 (citing *Smith v. Heckler*, 782 F.2d 1176, 1182 (4th Cir. 1986)).

## III. ALJ's FINDINGS OF FACT AND CONCLUSIONS OF LAW

The ALJ is required to employ a five-step sequential evaluation in every Social Security disability claim analysis to determine the claimant's eligibility. It is this five-step process that the Court examines on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Acting Commissioner is supported by substantial evidence in the record. 20 C.F.R. § 416.920. The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong*, 2011 WL 2938084, at *3 (citing 20 C.F.R. §§ 404.1520, 416.920). "An affirmative answer to question one, or negative answers to questions two or four, result in a

4

determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

In accordance with the five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, Ms. Williams has not engaged in substantial gainful activity ("SGA") since May, 21, 2010, the application date. R. 13.[4] Second, Ms. Williams had the following severe impairments: asthma, degenerative disc disease of the lumbar spine, obesity, and reading disorder. R.13-14. The ALJ went on to find that these four "limit the claimant's physical and mental abilities to do basic work activities, including standing, walking, lifting, carrying, engaging in postural activities, and understanding and carrying out written instructions." R. 14. The ALJ concluded that the four impairments, "both singly and in combination," limit Ms. Williams's ability to work, and are thus severe. *Id.* Third, Ms. Williams does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in sections 1.00, 3.00, or 12.00 of 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 14-16.[5] Specifically, the ALJ found "the severity of the claimant's reading disorder does not meet or medically equal the criteria of listing 12.02 pertaining to Organic Mental Disorders. While the claimant demonstrates signs and symptoms satisfying the 'paragraph A' criteria, the [ALJ found] that the 'paragraph B' criteria are not satisfied." R. 15. Fourth, Ms. Williams has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), with the exception that she perform only occasional postural

---

[4] Generally, an ALJ will use the date of onset with regard to step one; however, Ms. Williams failed to appeal the prior ALJ Decision of April 19, 2010. R. 49-59. Thus, although not entirely clear from the record, the ALJ used the date of this application.

[5] While the ALJ provided substantial analysis regarding Ms. Williams's asthma, degenerative disc disease of the lumbar spine, and obesity, R. 13-15, these impairments are not at issue on judicial review. ECF Nos. 8 and 10 at n.2.

activities, must avoid exposure to excessive dust, smoke, fumes, and chemicals, and have no work requiring written instructions – only instruction by demonstration. R. 16-19. Fifth, while Ms. Williams had no past relevant work, the ALJ found that considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Ms. Williams could perform. R. 19-20. Therefore, the ALJ determined that Ms. Williams has not been under a disability from May 21, 2010, through August 3, 2012, the date of the ALJ's decision. R. 20-21.

## IV. RELEVANT FACTUAL BACKGROUND

In each of her three applications, dated September 23, 2003, January 3, 2008, and May 21, 2010, Ms. Williams alleged a disability onset date of September 24, 2003. R. 11, 49. As of May 21, 2010, the date of this application for SSI, Ms. Williams was a 46-year-old female who left school at age 15 after completing the fifth grade but before completing the sixth grade. R. 135, 151. Her school records indicate she attended the Portsmouth, Virginia Public Schools for approximately ten years from the fall of 1968 until the fall of 1978. R. 151. Ms. Williams left the sixth grade in the fall of 1978 and subsequently attended vocational school at the age of 15. *Id.* at 151-52. Throughout elementary school, Ms. Williams failed to perform satisfactorily in every class, with a few exceptions in art, music, and physical education. *Id.* at 151. Moreover, her standardized achievement and aptitude test data reflect test scores as low as the first percentile and as high as only the twenty-third percentile. R. 156. However, no individual IQ test appears in her school records. At the ALJ hearing held on July 24, 2012, Ms. Williams provided the following additional information via testimony:

Ms. Williams resides with her nieces at their apartment. R. 29.[6] Ms. Williams last had her own residence in or around 2001. *Id.* Ms. Williams and her husband are currently separated, and her preceding contact with him was two months prior to the ALJ hearing. *Id.* Ms. Williams has two children, both of whom are high school graduates and live in Charleston. R. 30.[7] Ms. Williams finished the fifth grade and does not have a GED. *Id.*

During the day, Ms. Williams watches her nine-year-old niece, who is rather self-sufficient. R. 39. Ms. Williams is able to wash the dishes and straighten up, but she becomes tired quickly and must stop frequently to rest. R. 40. Ms. Williams is also able to do other chores, but her nieces complete the chores when she is not feeling well enough, which happens about once or twice each month. *Id.* Ms. Williams receives her own food stamps, and her nieces take her grocery shopping. R. 40-41. Ms. Williams can pick out her own items, but her nieces will take over the shopping once she becomes too tired to continue. R. 41. Ms. Williams mentioned her inability to read food labels, which causes her to rely on the container's appearance to recognize what she enjoys eating. *Id.*

When asked about her reading ability, Ms. Williams testified that she did not know what she could read, but that she cannot read her own mail. R. 30-31. In fact, Ms. Williams implied she cannot read or write anything other than her name, and she has never obtained, or attempted to obtain, a driver's license. R. 31. Moreover, Ms. Williams has never owned a bank account. *Id.* Nevertheless, when asked if she can count money, she replied that she could count and that she was sure the cashier gives her the right change when she shops with cash. R. 31.

---

[6] Apparently Ms. Williams has more than one niece. The record indicates that at the time of the ALJ hearing, Ms. Williams had a nine year old niece, and an older niece, who could drive her places. R. 29, 32, 39-41.

[7] It is unclear whether this is Charleston, SC or Charleston, WV.

Regarding transportation, Ms. Williams's older niece often drives her. R. 32. She occasionally rides the bus, but rarely ever alone. R. 32-33. Yet Ms. Williams does recognize bus numbers and can remember which bus to take with guidance prior to a trip. *Id.*

Concerning her work history, Ms. Williams last worked in 1989. R. 33. She worked at a hotel for about four months, but there was not enough business to continue her employment. R. 33-34. She then worked for two months at SPSA[8] on a private contract, but she discontinued her employment after breaking her elbow. R. 33.

In relation to current physical health problems, Ms. Williams recalled having asthma-related breathing problems since about 2000. R. 34. She does not currently have problems daily, R. 35, but on a routine basis, she can hear herself wheezing, R. 38. About three days each week she uses her nebulizer at home approximately every four hours, R. 35, along with a puff inhaler, R. 38. However, about once a month or so, her home breathing treatments fail, and she requires a visit to the emergency room. R. 35-36. Sometimes the hospital will keep her overnight for a few days until her breathing is controlled. R. 36-37. In addition to asthma, Ms. Williams also has trouble controlling her diabetes and cholesterol, R. 37-38, and she regularly has muscle spasms in her lower back, R. 38. At the time of the hearing, Ms. Williams was the heaviest she had ever been, weighing 205 pounds. R. 42.

In reaching his decision that Ms. Williams was not disabled in step three, the ALJ found that Ms. Williams's "medically determinable severe impairments [were] not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in section[] . . . 12.00 Mental Disorder of the Listing of Impairments . .

---

[8] Presumably this is the Southeastern Public Service Authority, but again, the record is not clear.

. " R. 14.[9]  Specifically, in step three the ALJ found Ms. Williams's "reading disorder" did not

meet the criteria of Listing 12.02 Organic Mental Disorders because, although she satisfied

paragraph A, Ms. Williams failed to satisfy paragraphs B or C. R. 15.[10]  The ALJ did not

address how Ms. Williams satisfied paragraph A, or how she failed to satisfy paragraph C;

however, he did provide considerable analysis explaining how Ms. Williams did not satisfy

paragraph B. *Id.* Paragraph B criteria require a Social Security claimant to meet at least two of

four specified areas. R. 15. Specifically, the ALJ found Ms. Williams had no restrictions in

activities of daily living, because "she remain[ed] fairly independent in performing personal care,

meal preparation, household chores, travelling, shopping, handling her finances, and social

activities," *Id.* (citing R. 168-75), or social functioning, because "she allege[d] no problems in

getting along with peers, family members or authority figures," R. 16. Furthermore, the ALJ

found Ms. Williams only had "moderate difficulties" in concentration, persistence, or pace,

because "struggles with reading and writing slow her ability to complete written tasks." *Id.*

Lastly, the ALJ found no episodes of decompensation. *Id.* Thus, because Ms. Williams did not

meet two of the four criteria under paragraph B, the ALJ concluded Ms. Williams was not

disabled according to Listing 12.02. *Id.*

　　　In his functional capacity assessment, the ALJ generally stated that Ms. Williams's

"medically determinable impairments could reasonably be expected to cause the alleged

symptoms; however, the claimant's statements concerning the intensity, persistence and limiting

effects of these symptoms [were] not credible to the extent they [were] inconsistent with the . . .

residual functional capacity assessment." R. 17. Later, the ALJ reiterated that Ms. Williams's

"participation in extensive daily activities render[ed] her subjective complaints less than fully

---

[9] *See supra*, n. 5 regarding ALJ's substantial analysis of impairments not on judicial review.

[10] The ALJ mentions no other 12.00 Listing in addition to Listing 12.02.

credible." R. 19. The ALJ then provided a more detailed assessment of the paragraph B criteria by stating Ms. Williams was "independent in personal care; she cooks and prepares simple meals daily; she cleans her house; she travels by walking, by public transportation, and by car and travels alone; she shops for groceries in stores; she handles her own finances; and she socializes with relatives." *Id.* (citing Ex. 3E).[11] The ALJ concluded his assessment by finding Ms. Williams's had

> the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) due to her back pain and obesity, except further crediting her complaints of back pain and limitations secondary to obesity, she can perform only occasional postural activities; she must avoid exposure to excessive dust, smoke, fumes, and chemicals due to her history of asthma; and in light of her illiteracy, she cannot perform work requiring written instructions-- the instructions must be by demonstration only.

R. 19.

In step five, the ALJ's only reference to Ms. Williams's impairment was that she "ha[d] a marginal (5th grade) education and is able to communicate in English." R. 19. At no point in the ALJ decision dated August 3, 2012, did the ALJ reference any medical evidence regarding Ms. Williams's inability to read. R. 11-21. Rather, all substantiation of her illiteracy was either not cited or came directly from Ms. Williams's own testimony. R. 14-19. Moreover, the ALJ devoted approximately three pages to addressing the medical evidence supporting his decision regarding asthma and degenerative disc disease of the lumbar spine. R. 14-19.

## V. ANALYSIS

Plaintiff seeks judicial review of the Acting Commissioner's final decision, arguing the decision is not supported by substantial evidence in the record, and that the ALJ failed to apply the correct legal standard. ECF No. 8 at 2. Specifically, first, Plaintiff alleges the decision of the Acting Commissioner to deny Plaintiff benefits is not supported by substantial evidence in the

---

[11] It appears the ALJ meant to cite "Ex. 4E," R. 168-75.

record because the ALJ did not properly develop the record by ordering a consultative examination to evaluate the Plaintiff's Intelligence Quotient ("IQ"). *Id.* at 2-3. Second, Plaintiff alleges the ALJ "failed to evaluate this claim under the appropriate provision of the Listing of Impairments," i.e. he incorrectly considered Listing 12.02 instead of Listing 12.05. *Id.* at 2. Because the Plaintiff believes these errors are not harmless, she requests this Court remand the case for the ALJ to order a consultative examination to include an assessment of the Plaintiff's IQ, and then to award benefits if the IQ score falls into the proper range for Listing 12.05(B) or (C). *Id.* at 21.

In opposition to these allegations, the Acting Commissioner argues the ALJ was not obligated

> to order a consultative examination to further evaluate Plaintiff's alleged intellectual impairment, and substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of *any* of the listed impairments set forth in Listing 12.00 . . . including Listing 12.05.

ECF No. 10 at 1-2 (emphasis in original) (citing 20 C.F.R. Part 404, Subpart P, App. 1.) The Acting Commissioner further argues that even if the Court determines the ALJ failed to comply with the obligation to order a consultative examination and/or failed to utilize a Listing 12.05 analysis in determining Plaintiff's case, Plaintiff cannot show such errors require remand or reversal because such error is harmless, resulting in the same outcome − denial of benefits. ECF No. 10 at 14. The Acting Commissioner bases this argument on her conclusion that Plaintiff cannot establish deficits in adaptive functioning necessary for Listing 12.05. *Id.*

For the reasons more fully discussed below, the undersigned recommends that the Plaintiff's motion for summary judgment be granted, and that this case be remanded to the ALJ for proceedings consistent with this recommendation. Specifically, the undersigned finds that

under the facts of this case, the ALJ had a duty to order a consultative examination because the record was not fully developed, and that as a matter of law, the ALJ failed to evaluate Ms. Williams's claim under the correct mental impairment Listing.

### A. The ALJ has the duty to order a consultative examination when the record is not fully developed.

In the first allegation, Plaintiff argues that the record was not fully developed because the ALJ failed to order a consultative examination to determine Plaintiff's intellectual functioning, and without an IQ score, the ALJ's decision is not supported by substantial evidence. ECF No. 8 at 10-17, 21. Moreover, Plaintiff argues this information might have changed the outcome of the case, meaning the ALJ could have awarded benefits. ECF No. 8 at 15. The Acting Commissioner denies that the ALJ had the obligation to provide a consultative examination, because there is sufficient evidence upon which the ALJ could base his decision without further development of the record. ECF No. 10 at 9-10.

"Plaintiff has the burden of proving that she meets or equals a listing." *Henry v. Colvin*, No. 3:13-cv-357, 2014 WL 856358, at *7 (E.D. Va. March 4, 2014) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5. (1987)). However, "[t]he ALJ has the duty to fully and fairly develop the record." *Strong*, 2011 WL 2938084, at *5 (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). "[The claimant] may not be willing or able to fully or accurately describe the limitations resulting from [her] impairment(s). Thus, we will carefully examine the statements [she] provide[s] to determine if they are consistent with the information about, or general pattern of, the impairment as described by the medical and other evidence, and to determine whether additional information about [her] functioning is needed from [her] or other sources." 20 C.F.R. § 404 Subpart P, App. 1 § 12.00(D)(1)(b). "The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about

an impairment to determine whether the claimant is disabled." *Strong*, 2011 WL 2938084, at *6 (citing 20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986)). "In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his own views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974); *McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983)). "A consultative examination is warranted when there is an inconsistency in the evidence or 'when the evidence as a whole is insufficient to allow us to make a determination or decision' on a claim." *Hoy v. Colvin*, No. 5:12cv70, 2013 WL 4010647, at *4 (W.D. Va. Aug. 5, 2013) (*citing* 20 C.F.R. §§ 404.1519(a), 416.919(a)). "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." *Huddleston v. Astrue*, 826 F. Supp. 2d 942, 958 (S.D. W. Va. 2011) (quoting *Ripley v. Chater*, 67 F. 3d 552, 557 (5th Cir. 1995)). Standardized intelligence tests are used to assist in confirming the presence of intellectual disability or organic mental disorder, and "are essential to the adjudication of all cases of intellectual disability," except Listing 12.05(A). 20 C.F.R. § 404 Subpart P, App. 1 §§ 12.00(D)(6)(a)-(b).

In *Hoy v. Colvin*, the court ordered a consultative examination because the ALJ based his decision on a "sparse" record of the plaintiff's mental condition, despite the fact the record lacked substantial support to determine whether the plaintiff was or was not disabled. *Id. Hoy* stands for the proposition that the ALJ should order a consultative examination rather than substituting his own opinion when substantial support in the record is lacking. *Hoy*, 2013 WL 4010647, at *4. Thus, the ALJ does not have the discretion to refuse to order a consultative

examination when the record is not sufficiently developed, and the ALJ cannot submit his own diagnosis in lieu of obtaining a proper diagnosis.

In the present case, the ALJ recognized the record was not fully developed, noting, "[Plaintiff] has a medically determinable reading disorder even though she has not been formally diagnosed with such." R. 14.[12] However, there is no support in the record for the ALJ to change her diagnosis to a "reading disorder," especially in light of the fact that the sources addressing the issue refer to it as a "learning disability." R. 28, 51, 63, 69, 76-77, 82. Moreover, the Plaintiff's testimony that she could not read or write more than her name, in addition to her very poor scholastic achievement, suggest she may not be able to fully and accurately describe the limitations of her impairment. Like in *Hoy*, the ALJ should not have imposed his own label – he should have ordered a consultative examination to determine Plaintiff's diagnosis. Without a standardized intelligence test devoted to determining Plaintiff's intellectual functioning, it is impossible to determine her diagnosis, and thus Plaintiff is prejudiced by the ALJ's current decision. For these reasons and those discussed below, the undersigned recommends reversal and remand for the administration of an IQ test.

### B. The ALJ failed to evaluate this claim under the proper Listing.

In the second allegation, Plaintiff argues the ALJ erroneously analyzed Plaintiff's application under Listing 12.02, and the ALJ should have analyzed this case under Listing 12.05 instead. ECF No. 8 at 17-20. The Acting Commissioner characterizes the ALJ's mistake, if any, as harmless error. ECF No. 10 at 14. Moreover, the Acting Commissioner claims the ALJ

---

[12] "Consistent with the statements made in her Disability Report . . . and Function Report . . . , the claimant testified that she could not read or write much more than her name. She further testified that she completed school only through the 5th grade (having been deemed learning disabled). She did not attempt to get her GED and ever (sic) attempted to take the written examination to get her driver's license. Due to these factors, the undersigned finds that the claimant has a medically determinable reading disorder even though she has never been formally diagnosed with such." R. 14.

corrected any error by encompassing Plaintiff's inability to read into his residual functional

capacity analysis by requiring her job be limited to tasks with non-written forms of instruction.

*Id.* at 14-15.

### 1. The ALJ's analysis of Listing 12.02 Organic Mental Disorders is incorrect.

Plaintiff argues Listing 12.02 was never applicable to her application. ECF No. 8 at 19.

Listing 12.02 reads as follows:

*Organic Mental Disorders:* Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
1. Disorientation to time and place; or
2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
4. Change in personality; or
5. Disturbance in mood; or
6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.02 relates to Organic Mental Disorders; specifically, the Listing calls for a "[h]istory and physical examination or laboratory tests [that] demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. § 404 Subpart P, App. 1 § 12.02. There have been no allegations of loss of any previously acquired functional ability, much less mention of a specific illness or injury which could have caused a decline in cognitive functioning, or any physical examination results and laboratory tests to support such a finding. ECF No. 8 at 19. On the contrary, Plaintiff's school records indicate she has always had an inability to "write much more than [her] name," as demonstrated by her unsatisfactory grades. R. 151. Analyzing Plaintiff under 12.02 was therefore error, but not necessarily reversible error in and of itself.[13]

---

[13] It appears the ALJ based his decision to use Listing 12.02 on the fact that the September 10, 2010 Disability Determination Explanation ("DDE") referred to Listing 12.02. R. 64-65. However, even that DDE noted that none, not even the A criteria of 12.02, "precisely" applied to Plaintiff. *Id.* at 64. The prepopulated portion of that DDE states Kim Sweifer, Ph.D., who filled out that particular section of the DDE, "indicated that the individual has either an organic mental, schizophrenic, etc., or affective disorder(s) . . . " *Id.* at 64. However, this is directly contradicted by the portion she manually filled out stating, "A medically determinable impairment is present that does not precisely satisfy the [A criteria of the Listing]." *Id.* at 64. More importantly, in the reconsideration of the September 10, 2010, DDE, when Stephen P. Saxby, Ph.D., filled out another DDE on April 25, 2011, he changed Dr. Sweifer's diagnosis of Organic Mental Disorder to his own diagnosis of Learning Disorder, but apparently forgot to update the analysis section of his new diagnosis. R. 77. Thus, Dr. Saxby's form still reflects Dr. Sweifer's analysis of Organic Mental Disorder instead of his analysis of Learning Disorder. R. 77. Therefore, the ALJ used an inaccurate diagnostic analysis in reaching his decision on August 3, 2012. R. 11-21. Thus, there is not substantial evidence in the record to support the ALJ's finding that Listing 12.02 was the proper Listing under which to analyze Plaintiff's application.

16

### 2. The ALJ should have analyzed Plaintiff's claim under Listing 12.05 Mental Retardation.

Even though Listing 12.02 was not the proper Listing under which to analyze Plaintiff's application, the ALJ committed no reversible error by simply announcing a truism – Plaintiff did not qualify for benefits under Listing 12.02.[14] Thus, Plaintiff can only succeed on her claim for benefits if she qualified under another relevant Listing, or at least provided ample evidence to suggest she might qualify. *Huddleston*, 826 F. Supp. 2d at 958; *Beckman v. Apfel*, 2000 WL 1916316, at *9.

In *Strong v. Astrue*, the court held it imperative that in step three "the ALJ identif[y] the relevant listed impairments and compare[] the listing criteria with the evidence of the claimant's symptoms." *Strong*, 2011 WL 2938084, at *8 (citing *Cook v. Heckler*, 783 F.2d at 1173 (stating that without completing this identification and comparison, "'it is simply impossible to tell whether there was substantial evidence to support the determination'"); *Beckman v. Apfel*, No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) (unpublished opinion) (requiring an ALJ's "full analysis to determine whether the claimant's impairment meets or equals the listing" when "ample" facts support a particular listing) (citing *Cook*, 783 F.2d at 1172)).

Notably, the ALJ failed to specifically mention, let alone analyze Plaintiff under Listing 12.05, despite her attorney expressly requesting the ALJ do so at the hearing on July 24, 2012, R. 28, and despite the prior ALJ's analysis of Listing 12.05 in his decision dated April 19, 2010, R. 49, 51-56. Under these circumstances, contrary to the Acting Commissioner's argument, in the

---

[14] The Acting Commissioner's assertion that the ALJ's incorporation of Plaintiff's reading disorder in steps four or five corrected any error is not necessarily true. "If a claimant's impairment . . . meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404 Subpt. P, App.1[,] . . . the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience." Strong, 2011 WL 2938084, *4 (citing 20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d)). Thus, not awarding benefits in steps four or five could not possibly be commensurate with analyzing Plaintiff under Listing 12.05, determining Plaintiff is disabled, and then actually awarding her benefits in step three.

absence of a specific explanation as to why Plaintiff failed to meet the requirements under

Listing 12.05, it is likely not adequate that the ALJ stated Plaintiff did not meet Listings in 12.00

across-the-board.  However, in order to determine if the AJL committed reversible error by not

analyzing Listing 12.05, it is necessary to determine if ample evidence exists that Plaintiff might

have met the requirements.  *Cook*, 783 F.2d at 1172.  Listing 12.05 reads as follows:

> *Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

### a. The claimant must first meet the capsule definition of the Listing.

Listing 12.05 begins with the capsule definition in the introductory paragraph, also

known as the diagnostic description.  The diagnostic description of Listing 12.05 requires

significantly subaverage general intellectual functioning with deficits in adaptive functioning, which must have begun before the age of 22. 20 C.F.R. § 404 Subpart P, App. 1 § 12.05. Although there is no standard of measurement for the term, *Strong*, 2011 WL 2938084, *8 (citing *Wall v. Astrue*, 561 F.3d 1048, 1073 (10th Cir. 2009) (Holloway, C.J. dissenting)), deficits in adaptive functioning "limit functioning in one or more activities of daily living, such as communication, social participation and independent living," *Henry v. Colvin*, 2014 WL 856358, at *9 (quoting DSM-5 33 (American Psychiatric Association (2013))), and "can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety," *Henry v. Colvin*, 2014 WL 856358, at *9 (quoting *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)).

In *Henry v. Colvin*, the Court held that Plaintiff did not meet the diagnostic description of Listing 12.05 because he did not have significant general intellectual functioning with deficits in adaptive functioning. 2014 WL 856358, at *11. In that case the plaintiff indicated he could read and write more than his name, he earned passing grades in general education classes in the ninth grade, and he made written reports while employed as a pipe layer and a tow truck driver during the 1980's and 1990's. *Id.* at *1-2. The Court held "the failure to complete high school does not establish deficits in adaptive functioning." *Id.* at *10. Thus, the court found the plaintiff to have participated in substantial gainful activities "inconsistent with deficits in adaptive behavior before age 22." *Id.* at *1-2.

Conversely, in *Turner v. Bowen*, the plaintiff was socially promoted to the tenth grade despite his inability to read and write. 856 F.2d 695, 696 (4th Cir. 1988). The court held this constitutes a clear "manifestation" of mental retardation occurring before the age of twenty-two,

requisite to meet the capsule definition. *Id.* at 696, 699. The court then ordered a complete consultative examination to include an IQ test to determine if the plaintiff met Listing 12.05(C) specifically. *Id.* at 698. The plaintiff scored 67, and the court awarded benefits. *Id.* at 698-99.

   In *Luckey v. U.S. Dept. of Health and Human Servs.*, the court extended the *Turner v. Bowen* premise by holding "evidence that [claimant] could *barely* read or write was a clear manifestation of mental retardation occurring before age twenty-two." 890 F.2d 666, 688-69 (4th Cir. 1989) (emphasis added). There, the plaintiff completed five grades of schooling and participated in 60 to 80 hours of work each week thereafter. *Id.* at 667. Nonetheless, based on his illiteracy, the court held "the absence of an IQ test during the developmental years does not preclude a finding of mental retardation predating age 22." *Luckey*, 890 F.2d at 688 (citing *Branham v. Heckler*, 775 F2d. 1271, 1274 (4th Cir. 1985)); *see also Strong*, 2011 WL 2938084, at *10. Without evidence to the contrary, it is assumed that the claimant's IQ score from later in life would be equivalent to one from earlier in life, had it been assessed. *Id.* Based on the plaintiff's IQ score, his being barely literate before the age of 22, and the ALJ's determination in step two that he had a severe impairment, the court held the plaintiff met all of the requirements under Listing 12.05(C). *Luckey*, 890 F.2d at 669.

   In *Holtsclaw v. Astrue*, the ALJ concluded Listing 12.05 did not apply to the case because the plaintiff failed to meet the diagnostic description since she had "only moderate limitations with social/interpersonal skills, use of community resources, self-direction, functional academic skills, [and] work or leisure abilities," and she completed CNA training. No. 1:10-cv-199, 2011 WL 6935499, at *3-4 (W.D.N.C. Dec. 30, 2011). Nevertheless, the court found "abundant evidence in the record to suggest the manifestation of deficits in adaptive functioning before age 22," including attendance in special education classes, a learning disability, and a history of poor

academic performance. *Id.* at *4. Specifically, in the ninth grade, the plaintiff only had four grades on her report card – two 70's in English and a 66 and a 70 in developmental math. *Id.* Furthermore, on achievement tests, the plaintiff scored as high as 57th percentile, but only received an overall score of 10th and 11th percentiles in the eighth and ninth grades respectively. *Id.* Moreover, the court discounted the ALJ's determination that the plaintiff had only moderate limitations in social functioning for lack of support of substantial evidence because, among other things, the plaintiff had never lived independently – not even while married. *Id.* at *5.

In *Strong v. Astrue*, the plaintiff repeated certain grades and attended special education classes beginning early in elementary, and he eventually dropped out of school when he was twice held back in eighth or ninth grade. 2011 WL 2938084, at *11. The court found the plaintiff was functionally illiterate after eleven years of schooling, which the court considered a sufficient indication of the plaintiff's subaverage general intellectual functioning and deficits in adaptive functioning for purposes of Listing 12.05's diagnostic description. *Id.* at *11, n.12; *see also Davis v. Astrue*, No. 2:07-1621, 2008 WL 1826493, at *4 (D.S.C. Apr. 23, 2008). Moreover, the ALJ failed to list the elements of Listing 12.05, much less mention the Listing by name. *Id.* at *9. Although it is likely the ALJ analyzed the plaintiff under Listing 12.05, as supported by statements he made, the court held the failure to expressly discuss the Listing was sufficient to remand the case for the ALJ to "properly" review it under Listing 12.05. *Id.*

Here, although the Acting Commissioner argues to the contrary, R. 11-12, Plaintiff can meet the capsule definition of Listing 12.05. Like in *Holtsclaw*, Plaintiff's deficits limit her functioning of daily living, which is supported by the Disability Determination Explanation

("DDE") dated September 9, 2010, R. 66, and the ALJ's decision, R. 19.[15] Specifically, unlike in *Henry*, Plaintiff has deficits in her ability to communicate through the written word. Additionally, like in *Turner*, *Luckey*, *Strong*, and *Holtsclaw*, Plaintiff has limitations in functional academic skills, which is supported by her school records – extremely low grades and standardized test scores. R. 151. While the Acting Commissioner would like to distinguish Plaintiff from *Turner* because Plaintiff's inability to write is "less clear," and because she has the "ability to function independently in spite of her claimed inability to read," ECF No. 10 at n.6, that argument fails for three reasons. First, the ALJ found she did have deficits in reading, so her ability is not "less clear." Second, *Luckey* extends the capsule definition to include Plaintiff even if she can only barely write. Third, both *Luckey* and *Holtsclaw* involve plaintiffs who participated in much greater employment than Plaintiff, and yet they were still awarded benefits because a determination of impairment under Listing 12.05 trumps prior work experience. Moreover, Plaintiff's school records demonstrate that Plaintiff manifested such deficits throughout her ten years of schooling until she was 15 years old, well before the cutoff at age 22. R. 151. Thus, although the Acting Commissioner is correct that "the failure to complete high school does not establish deficits in adaptive functioning," ECF No. 10 at 12, Plaintiff here failed to complete the sixth grade, having spent approximately equivalent time in school as the plaintiffs in *Turner* and *Strong*. Finally, like in *Strong*, the ALJ failed to list the elements of Listing 12.05, thus necessitating reversal and remand without further analysis of the ALJ's decision. In conclusion, Plaintiff meets the capsule definition of Listing 12.05 because she has significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifesting before age 22.

---

[15] Although the ALJ states Plaintiff has no restriction in her activities of daily living, R. 15, he accommodates her inability to communicate through written word anyway, R. 19, thus contradicting himself as to whether the claimant has a restriction in her activities of daily living.

*b. The claimant must also meet one of the four severity prongs of the Listing.*

Regarding the severity prongs, Listing 12.05 Intellectual Disability has a different structure concerning paragraph B criteria than most other 12.00 Mental Disorders Listings. *See* 20 C.F.R. § 404 Subpart P, App. 1 § 12.00(A). In order to be found impaired, a claimant must meet one of the four severity prongs – subparagraphs A-D. *Id.* While paragraph D "contains the same functional criteria that are required under paragraph B of the other mental disorder listings," a claimant may be eligible under Listing 12.05 without meeting paragraph D criteria by meeting one of the other three paragraphs. *Id.* Thus, although the Commissioner points to the prior April 19, 2010 ALJ decision to demonstrate that it is unnecessary to evaluate Plaintiff under Listing 12.05 because Plaintiff failed to meet paragraph B criteria, ECF No. 10 at 4, the ALJ was mistaken about the strict need to do so under Listing 12.05. R. 54-55. Plaintiff actually had two other viable paragraphs under Listing 12.05, depending upon the scores of an IQ test. 20 C.F.R. § 404 Subpart P, App. 1 §§ 12.05(B), (C).

Listing 12.05(B) only requires an IQ range requisite to meet a severity prong (59 or less). 20 C.F.R. § 404 Subpart P, App. 1 § 12.05(B). Concerning Listing 12.05(C), however, in addition to a specified IQ score, an impairment is required. "An impairment . . . is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." R. 12 (citing 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p, and 96-4p.) In *Holtsclaw v. Astrue*, the court held that the ALJ's determination of severe impairments in step two constituted an "impairment imposing an additional and significant work-related limitation of function" necessary to meet the second portion of Listing 12.05(C). 2011 WL 6935499, at *6.

Regarding the severity prongs, Plaintiff cannot possibly meet Listing 12.05(A) because the record supports the proposition that Plaintiff has the ability to attend to her personal needs such as toileting, eating, dressing, and bathing, and she has the ability to follow directions. R. 168-75. Nor can she meet Listing 12.05(D), because the record supports that she does not have marked restriction of activities of daily living, marked difficulties in maintaining social functioning or concentration, persistence, or pace, and she does not have any episodes of decomposition, much less repeated episodes. R. 15. Nonetheless, Listings 12.05(B) and (C) remain open to Plaintiff, depending on the outcome of an IQ test, which is "essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. § 404 Subpart P, App. 1 § 12.00(D)(6)(b)[16]. Thus, by itself, if the lowest of Plaintiff's valid verbal, performance, or full scale IQ is 59 or less, she meets Listing 12.05(B), and nothing further must be done for Plaintiff to be awarded benefits. 20 C.F.R. § 404 Subpart P, App. 1 §§ 12.00(D)(6)(c), 12.05(B). Likewise, if the lowest of Plaintiff's valid verbal, performance, or full scale IQ is 60-70, the first portion of 12.05(C) is met. 20 C.F.R. § 404 Subpart P, App. 1 §§ 12.00(D)(6)(c), 12.05(C). As specified in *Holtsclaw*, the ALJ has already determined that the second portion of Listing 12.05(C) has been met because in step two he found Plaintiff's asthma, degenerative disc disease of the lumbar spine, obesity, and reading disorder, "both singly and in combination[,] limit the claimant's ability to perform the mental and physical demands of work . . . are [thus] considered as severe." R. 14. *See also* 20 C.F.R. § 416.920(c). Therefore, contrary to the analysis of the prior ALJ who considered Listing 12.05,

---

[16] In addition to the raw scores, "the narrative report that accompanies the test results [that] comment on whether the IQ scores are considered valid" should be included in the assessment of 12.05(B) or (C) to ensure an accurate determination of Plaintiff's disability, 20 C.F.R. § 404 Subpart P, App. 1 § 12.00(D)(6)(a), as there is evidence Plaintiff can read and write more than just her name, R. 168-75, 193, 195. However, the ability to read and write at even a sixth grade level in not inconsistent with a determination of intellectual disability. ECF No. 8 at 12. Furthermore, *Luckey*, in combination with *Turner*, stands for the proposition that a claimant can meet Listing 12.05 even with very low reading and writing skills. *Luckey*, 890 F.2d at 668-69.

R. 54-55, and the argument of the Acting Commissioner, ECF No. 10 at 4, depending on the IQ score, Plaintiff could meet the requirements under either 12.05(B) or (C) without in any way addressing any "B criteria." Ample evidence was proffered to the ALJ that showed Plaintiff might have met a Listing under 12.05(B) or (C), thereby requiring him to obtain a consultative examination, as an inability "to read or write at age sixteen even after ten [years] of schooling [is] a clear 'manifestation' of mental retardation occurring before age twenty-two." *Turner*, 856 F.2d at 699. The failure to do so was not harmless and ALJ therefore committed reversible error. Accordingly, the undersigned recommends this case be reversed and remanded for the ALJ to order a consultative examination to include an IQ test, and then for the ALJ to analyze Plaintiff's application under Listing 12.05(B) and (C) in conjunction with the IQ test results.

## C. Conclusion

The ALJ should have ordered a consultative examination to include an IQ test because the record was incomplete and thus, there is not substantial evidence to support the ALJ's decision. Moreover, as a matter of law, the ALJ erred by evaluating Plaintiff's case under Listing 12.02, and he committed reversible error by failure to evaluate in writing Plaintiff's case under Listing 12.05. Plaintiff meets the diagnostic definition, and has the potential to meet two of the four severity prongs of Listing 12.05. Plaintiff could meet 12.05(B) with the requisite score. Moreover, because Plaintiff meets the requisite impairment for 12.05(C), should she score within the specified range, she could also satisfy all requirements for 12.05(C).

## VI. <u>RECOMMENDATION</u>

For these reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 7, be **GRANTED** to the extent it seeks reversal and remand of the Acting Commissioner's decision, the Defendant's Motion for Summary Judgment, ECF No. 9,

25

be **DENIED**, the final decision of the Acting Commissioner be **VACATED**, and that this matter be **REMANDED FOR FURTHER PROCEEDINGS**.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this report and recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. The Chief United States District Judge shall make a de novo determination of those portions of this report and recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this report and recommendation to the counsel of record for the Plaintiff and Defendant.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
July _10_, 2014

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

Mr. John O. Goss
GOSS & FENTRESS
735 Newtown Road, Suite 100
Norfolk, Virginia 23510
Counsel for Plaintiff

Mr. Daniel P. Shean
Assistant United States Attorney
United States Attorney's Office
101 West Main Street
Norfolk, Virginia 23510-1671
Counsel for Defendant

Fernando Galindo
Clerk of Court

_____
Deputy Clerk
July _____, 2014